UNITED ENGINEERS AND CON-
STRUCTORS, INC., Appellant,

v.

Curtis A. BRANHAM and Hartford Acci-
dent & Indemnity Co., Appellees.

Supreme Court of Kentucky.

April 1, 1977.
Rehearing Denied June 10, 1977.

Robert P. Woods, Kenneth Williams, Jr., Gray, Woods & Cooper, Ashland, for appellant.

Creech, Hogg & Williams, Ashland, for Curtis A. Branham.

Howard VanAntwerp, III, Ashland, for Hartford Acc. & Indem. Co.

PALMORE, Justice.

United Engineers & Constructors, Inc. (hereinafter "United"), appeals from a judgment awarding Curtis A. Branham and Hartford Accident & Indemnity Company (hereinafter "Hartford") the total sum of $78,445.78 for personal injuries suffered by Branham in an industrial accident. $6117.35 of that amount represents Hartford's indemnity claim for workmen's compensation payments made by it to Branham.

The accident happened on May 12, 1965, at a construction project being carried out by United under a contract with Armco Steel Corporation (hereinafter "Armco"), the owner of the premises on which it occurred. Branham was working on a crane, or dragline, leased "F.O. & M." (fully operated and maintained) from E. B. Lowman. Branham's theory of recovery is that his injuries were caused by the negligence of United's employes, for which he has a common-law right of action against United. United's theory, aside from the basic issues of negligence and contributory negligence, is that Branham's right of recovery is limited to his compensation claim against Lowman (paid by Hartford) and that the "exclusive remedy" statute, KRS 342.700 (formerly KRS 342.060), precludes a common-law right of action by Branham against United. Hartford's claim is that its exposure to liability for Branham's compensation benefits resulted from United's negligence and that Hartford therefore has a common-law right of indemnity against United, which right, Hartford contends, is unaffected by any contributory negligence on the part of Branham. Cf. *Whittenberg Eng. & Const. Co. v. Liberty Mut. Ins. Co.,* Ky., 390 S.W.2d 877 (1965).

The case was heard by a jury in September of 1973. It found that the accident resulted from the negligence of United's employes and rejected the defense of contributory negligence. The instruction under which it found against United conditioned liability on a finding that United, through Elmer Decker, its superintendent in charge of the project, had "assumed responsibility" for the particular activity in which Branham was engaged at the time of the accident, thus placing Decker and his workmen under the duty of exercising ordinary care for Branham's safety, and that the accident resulted from their failure to comply with that duty.

Our view of the case, discussed more fully below, is (1) that the employes of United whose negligence is said to have caused the accident were assisting the crane crew in work for which the crane crew was respon-

sible and, in the performance of that particular work, were under the supervision of the crane crew alone, and not of Decker or United; and (2) that even if this were not so, KRS 342.700 denies a common-law recovery to Branham under the "up-the-ladder coverage" principle expressed in *Bright v. Reynolds Metals Company*, Ky., 490 S.W.2d 474, 477 (1973). Our holding that United was not responsible for negligence of its employes in assisting the crane crew disposes of Hartford's indemnity claim.

The heart of the controversy lies in the legal relationships among the various parties. Branham and Hartford contend, for example, that United was not a prime contractor, but was merely an agent and servant of Armco. United claims that Branham was its "loaned servant" or, in the alternative, that Branham's employer, Lowman, was a subcontractor. Branham's response to these theories is that Lowman was not a subcontractor, but only the lessor of machinery, and that Branham was not a loaned servant of United. Still another contention by Branham and Hartford is that Lowman's agreement was with Armco, and not United, hence Lowman could not have been United's subcontractor.

It all began with a contract in the form of a letter from United to Armco dated and accepted on October 7, 1960, in which United, a construction contractor headquartered in Philadelphia, Pennsylvania, proposed to design facilities and act as constructors in connection with a contemplated expansion of Armco's "Ashland Works" at Ashland, Kentucky. As "Constructors" it agreed, when so ordered and directed by Armco, to execute "with our own forces the construction, and install the machinery and equipment, *subletting* [our emphasis] parts of the work when it is your advantage to do so, and turn the completed section or sections of the work over to you when ready for regular use." As "Purchasing Agents" it agreed to purchase the necessary construction equipment and materials and, as specified in writing by Armco, to "negotiate, prepare and let contracts for certain sections of the work and act as your own

Purchasing Department to the extent you may wish."

Important to the argument that United was an agent rather than a contractor for Armco is this provision of the proposal: "You [Armco] will have full control of all purchases and of the letting of all contracts. All contracts and orders placed by us [United] will be in your name, signed by us as Agents for you." Other terms of the proposal pertinent to this discussion were as follows:

1. United was to furnish at its own expense the services of its executive officers "who will direct and oversee the work performed under this agreement," together with the services of its home office Construction, Purchasing and Accounting Departments.

2. All other costs would be borne by Armco, but paid by United with funds advanced for that purpose by Armco.

3. United would maintain insurance coverage for public liability and property damage, automotive liability, and other specified perils, and save Armco harmless from any liability for injury or damage caused or allegedly caused by Armco employes, United's employes, or any subcontractors or their employes.

4. The cost of insurance for United's sole benefit "other than Workmen's Compensation and Employers' Liability" would be borne by United.

5. The contract would be terminable by Armco on 10 days' notice.

6. United's compensation would be a fixed fee equal to 4% of the total cost of the project.

E. B. Lowman was a contractor in Ashland who owned heavy equipment and leased it out whenever it was available for use by others. Sometimes it was rented "bare" and sometimes with an operating crew paid by Lowman. The rental of the crane involved in this accident was negotiated by A. E. Roscoe, general superintendent for United, with Lowman. It was covered by a purchase order issued by United on February 4, 1965, to which was attached

a rental agreement on a printed form headed by United's name. The agreement was signed by United, through Roscoe, as agent for Armco. Nominally, therefore, it was a contract between Lowman and Armco, and this is a basic premise of the argument that Lowman could not have been a subcontractor for United. United, on the other hand, maintains that Armco in effect contracted for the use and benefit of United, which was under contract with Armco to do the work for which the crane was being rented. Right here, we think, is a good place to stop and clear the decks with respect to the relationship between United and Armco.

During the course of pretrial proceedings the trial court entered a summary judgment in favor of United on the theory that United was a contractor and Lowman a subcontractor. Being reminded, however, that this would not dispose of Hartford's indemnity claim based on United's negligence, which would require a trial anyway, the trial court reconsidered and then finally vacated the summary judgment. It is interesting to note that in their brief responding to the motion for summary judgment, counsel for Branham conceded that United's status was that of a general contractor for Armco, a concession that was reflected by this recitation in the body of the summary judgment: "The parties to this action agree that United was the 'contractor' on the job." It is our opinion that on this point they were right the first time.

■ It would not be disputed that in determining whether one is an agent or servant or an independent contractor, substance prevails over form, and that the main dispositive criterion is whether it is understood that the alleged principal or master has the right to control the details of the work. Here we have a major construction project, undertaken by a company whose principal occupation is construction and for a company whose principal business is to produce steel. There was nothing in the contract between them, or in the evidence, such as it was, bearing upon the manner in which that contract was carried out, to suggest that Armco either had the qualifications and capacity to superintend the construction work, or intended, expected or actually did undertake to do so. The paper relationship between Armco and United obviously was designed for the purpose of placing upon Armco the burden of financing the project from beginning to end. In substance, United was its prime contractor.

■ Likewise, though it may not be vital to our resolution of the case, we think that the Lowman agreement's being put in the name of Armco as principal was strictly a matter of formality, and again merely a facet of the financial arrangement between Armco and United. It was United that decided where, when and what equipment was needed, and it was United's officer who negotiated and actually executed the rental agreement with Lowman. United's third-party beneficiary theory, though in our opinion certainly *apropos*, is not really indispensable to this result. The cold fact is that United, the party obligated to do the work for which the crane was needed, was the real party in interest, and we do not think the question of whether Lowman was a subcontractor under United can be made to stand or fall on the basis of the paper work. As it is, we need not find a stereotyped label for Lowman's common-law status, but there is much to be said for the proposition that one who furnishes equipment and operating personnel to be used by another in fulfilling his obligations under a construction contract is indeed a subcontractor, because, although the lessor does not contract to do things that are spelled out in advance in the form of written specifications, he does undertake that his men will do with the machinery the things they are directed orally to do while on the job. The only difference is in the time and form of the directions, "specifications" and "directions" being no more than variations of the same thing. Both tell somebody what to do.

The personnel furnished by Lowman with the crane consisted of an operator and an oiler. The rental rate payable to Lowman was $32 per hour for the machine and crew.

The crew was provided by a local union hall at Lowman's request. At the time of the accident in question South Tate was the operator and Branham, the plaintiff in this proceeding, was the oiler. As between United and Lowman, the mechanical operation and maintenance of the crane was at all times the responsibility of and under the control of its crew, the operator being in charge

The purpose for which United procured the services of the crane was to make a large excavation in the ground preparatory to the installation of a cold roll mill. The crane was operated around the clock with three crews working eight-hour shifts. The job was completed around 4:00 A.M. on May 12, 1965. Tate and Branham had worked the previous shift but stayed on overtime because of the imminence of the job's being finished. When it was done, United's foreman, Decker, instructed the crew to take the crane away to a parking area. In order for the crane to be moved out, however, it was necessary that its gantry be lowered so that the crane could pass through the doors of an adjacent building.

The gantry is a four-legged structure standing atop the cab of the crane. Through it pass cables that control the boom to which the bucket is attached. The front legs of the gantry are moveable, and are kept stable by pins inserted through holes at each foot. When these pins are removed the front legs of the gantry slide forward, thus lowering the gantry, through force of gravity, to the top of the cab. While the pins are being extracted the gantry must be held up by some other means in order to take the weight of the gantry off the pins and also in order to prevent a sudden drop of the gantry, which latter occurrence might cause one or more of the cables to be dislodged from its spool or drum and have to be rewound.

The safest method of holding the gantry aloft while the pins are being removed from its front feet is to do it with another crane if one is available. Otherwise it is done by placing the boom nearly upright and drawing the cables taut. In the course of that particular procedure, which is less desirable but not unusual, when the second pin is taken out the gantry instantly falls for a distance of a foot or so by reason of a certain amount of slack which cannot be taken out of the cable solely through the crane operator's pulling it tight from the controls inside the cab. During this procedure the operator is inside the cab and cannot see what is going on overhead. It is the responsibility of the oiler to lower the gantry. All of the witnesses agree, however, that the oiler cannot do it without help, and it is customary for the crane crew to look to the job superintendent to provide it. In this instance Decker assigned two of his laborers to give the crane crew whatever assistance it needed.

The purpose for which help is needed by the oiler in removing the pins from the legs or feet of the gantry is to ease the short drop of the gantry when the second pin is removed. Even a one-foot drop, if unbraked, entails the risk of dislodging a cable by causing a bounce, which is exactly what happened in this case and resulted in the gantry's falling on Branham. The easing or braking of the gantry through this short descent is accomplished by use of a steel bar or crowbar as a wedge under one of the feet of the gantry, holding it in place or letting it down gradually while the oiler, after removing the pin, gets out from under the gantry. On this particular crane it was necessary for Branham, the oiler, to be under the gantry while extracting the pins because they had to be put in and taken out from the inboard sides of the legs.

According to Decker, United had only two laborers, Damron and DeLong, on duty at the location of the crane when it became necessary to lower the gantry. Both testified for Branham. Damron said that Decker told him and DeLong to clean up the area "and if any of these guys on the crane needed anything to hand it to them," after which Decker returned to his office some distance away. At the request of Branham, who was on top of the crane, Damron handed up an iron bar he had been using for turning piling and removing scrap lumber.

According to Damron, at that time there were about three of United's men on the crane with Branham, and he saw them prying on something with the bar. He said that these men were craftsmen of some kind, but not laborers. He did not see the accident. Decker had been gone for "quite a while."

DeLong, the other laborer, testified that Decker did not say anything about lowering the gantry, but "told me if the boys needed anything to get it for them." Accordingly, he procured a hammer, a bar, a four-by-four and a two-by-four and placed them on top of the crane. He was unable to say who or how many people besides Branham were on the crane, nor did he witness the accident.

Branham himself, the plaintiff, gave the only eyewitness testimony. He was a trained and experienced heavy-equipment operator. As he describes it, his duties as oiler were to "service the crane, help move it, watch the operator and keep everybody out of the way." More importantly, he conceded that he and the operator "had complete charge of the crane" and that Decker, United's foreman, "had charge of where to take their dirt and where to place it" but had no control over the crane. He says that Decker and some of his men were present shortly prior to the accident and that Decker "hollered and told them to 'get the thing down so we can get it off the job.'" At this time, according to Branham, two of Decker's men were on the cab of the crane and Decker said, "Branham, would you go help the men take the gantry down?" Branham then climbed onto the cab and proceeded to remove the gantry pins. One of the other men, whom he did not know, had an iron bar in his hand. While Branham hammered the first pin out "they were just standing and watching," but when he moved over to the other side to take out the other pin they (the two unidentified men) placed the bar under the gantry leg and lifted the weight off the pin sufficiently to allow its being tapped out. At this point Branham says he told the two men to "take it easy and after I remove the

pin, hold it till I get out from underneath, then to ease it back down." Continuing with Branham's account, "They eased it up and I got the pin removed and, as I removed it, they jerked the bar and it bounced back up and throwed the cables loose and it [the gantry] come all the way back down on top of me."

Branham did not know or ask the two men helping him whether they knew anything about lowering a gantry. We gather from his testimony that he assumed they were qualified and probably relied on Decker in that respect. Decker himself, according to South, the operator of the crane, had asked South earlier that morning what the procedure was for lowering the boom to get the crane out. South told him the safe method was to use another crane, and Decker replied that he would try to get one. As a matter of fact, another crane was brought in after the accident.

Appearing for Branham, Tate was asked if he knew "whose job it was to lower the gantry on this particular crane on the date Mr. Branham was injured," and he replied as follows: "That comes under your operator's job. Your operator is supposed to take those down with the help of mechanics but the general practice is whatever craft you are working with, they go ahead and help." Recalled later, however, he qualified this statement by saying that the operator has that responsibility "unless it's taken away from him . . . I said it was previously if the mechanic or equipment foreman were there, if not, then the operator done what he was told." Tate said also that while he was pulling the boom into place prior to lowering the gantry Decker "was giving directions," that he considered Decker his boss, and that he would have done whatever Decker told him to do.

It is obvious from the transcript that after his first appearance on the witness stand Tate had to be warmed over in at least one other respect. On his first try he said that the proper way to remove the second pin would have been for the men to hold the pry bar under the opposite leg of

the gantry rather than under the same leg from which Branham was removing the pin, that this was a "freak accident," and that there was nothing that either Branham or the other workmen could have done to prevent it. Upon being recalled three days later, however, he said he had been thinking it over and had changed his mind. It was also during this appearance that he first mentioned the conversation with Decker about another crane.

In summary, Tate's evidence when taken most favorably to the plaintiff was that he considered Decker to be in charge and actually was being directed by Decker. No one, however, testified that Decker was present when the gantry was lowered, nor did anyone say that he gave any instructions as to how it was to be done. As a matter of fact, accepting Tate's own account of his earlier conversation with Decker on that very subject, in which Decker is said to have asked what the procedure was, Tate is bound to have realized that Decker did not know enough about it to be able to give any instructions with respect to lowering the gantry.

■ There was, of course, a good deal of other evidence, but we have confined our summarization to that which shows best for Branham. Any way it is viewed, clearly United had no responsibility for and no authority over the mechanical operation of the crane. Its prerogative was only to tell the operator when and where to dig and take the dirt. The custom of making the contractor's random personnel available to assist in lowering a gantry certainly cannot have the effect of transferring responsibility for that operation to the contractor. To the very contrary, in the light of all the might and main that has been exerted in this case over the question of whether the two members of the crane crew were "loaned servants" of the contractor, it seems to us that the reverse is true—that is, that in helping to lower the gantry the contractor's workmen become loaned servants of the crane crew. That is precisely what the court held in *Aetna Casualty & S.*

*Co. v. Manufacturers Cas. Ins. Co.,* 140 F.Supp. 579 (D.C.W.D.La., 1956), and we think it makes a good deal of sense.

To escape the horns of a dilemma Branham must, of course, avoid being held a loaned servant of United, and he cannot do so if he admits that United was in charge of lowering the gantry. Yet if he admits that the crane crew was in charge, then United's workmen were serving the crane crew rather than their own regular employer. He cannot avoid a checkmate through the stratagem of proving that United, by undertaking or assuming a responsibility that it was not obliged to assume, brought upon itself the duty of ordinary care toward the persons engaged in carrying it out, because if United did assume that responsibility the people taking its directions in doing the job became its own servants. We see no significant difference between United's having had the responsibility initially under its contract with Lowman and its having "assumed" that responsibility just before the accident. We are of the opinion that the evidence was not sufficient to justify a finding that Decker actually did assume it, but even if it had been, United was nevertheless entitled to a directed verdict on the ground that in assisting United's workmen Branham would also have become United's servant.

■ Under KRS 342.700(2) and its predecessor statute, KRS 342.060, "the general contractor is in effect made the employer of the employee of the subcontractor for the purposes of the compensation statute and . . . the general contractor thereby enjoys the immunity of an employer from suits by the subcontractor's employee when the facts are such that he could be made liable for compensation." *Whittenberg Eng. & Constr. Co. v. Liberty Mut. Ins. Co.,* Ky., 390 S.W.2d 877, 882 (1965). Obviously a "loaned servant" is in the same category, as he too becomes an employee of the principal contractor. Much drivel has been written on the loaned-servant theory, usually in an effort to fit a square peg into a round hole in order to fix liability on one

or the other of two employers. The personnel of automotive equipment furnished operated do not fit neatly into any of the familiar categories recognized at common law, so really it is better to abjure conceptualistic logic and apply simple reason instead. In some things the crew-members may be servants only of their regular employer, in others one or more of them may be servants of the contractor, and in still others both the contractor and the supplier of the operated equipment may be responsible to an innocent third party injured through negligence of the operating crew. It all depends on the facts. If, for example, the equipment is negligently run over a state inspector on the premises both masters might very well be held liable. For a more extensive discussion of the responsibility of two separate masters (hospital and surgeon) for the negligence of one servant or group of servants (nurses), see *City of Somerset v. Hart,* Ky., 549 S.W.2d 814 (decided today).

In this case the job was done and the machine was being rigged and battened down for departure. The procedure of lowering the gantry was peculiarly within the province and expertise of the crew. In that particular operation we agree that Branham and Tate were not loaned servants of United. On the other hand, they were performing a service for United pursuant to a contract in which they were assigned to that service by Lowman, their employer. Whether that arrangement justifies the inflexible label of "subcontract" as it might be considered apart from the compensation statutes we need not decide. Under those statutes, however, we think that it does. Beyond cavil, part of the package delivered by Lowman to United consisted of the services of two men. United in turn had contracted to perform those services for Armco. In the "up-the-ladder" context we construe the relationship between United and Lowman to have been that of contractor and subcontractor. United therefore was not "some other person than the employer" under KRS 342.700(1) or its precursor, KRS 342.055.

The judgment is reversed with directions that both claims be dismissed.

All concur.