35 F.3d 566
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Harrell MORLAN; Betty J. Morlan, Plaintiffs-Appellees,
United States Pollution Control, Inc., Intervenor-Appellee,
v.
GREEN RIVER STEEL CORPORATION; Athlone Industries, Inc.,
Defendants-Appellants,
Kentucky Utilities, Inc., Defendant,
PPM, Inc. of Georgia, Third party-Appellee.
 No. 92-5952.
 United States Court of Appeals, Sixth Circuit.
 Sept. 14, 1994.
 
 Before: KENNEDY and JONES, Circuit Judges; and GRAHAM, District Judge.[1]
 ORDER
 PER CURIAM.
 
 
 1
 This is a personal injury action brought on the basis of diversity of citizenship pursuant to 28 U.S.C. Sec. 1332 by an injured worker and his spouse against the company which contracted for the work and its parent company. A jury awarded monetary damages to the plaintiffs. The defendants appeal contending that plaintiffs' personal injury action was barred by the exclusive remedy provisions of the state of Kentucky's workers' compensation laws. KRS Secs. 342.610, 342.690. Defendants also allege that the trial court erred in excluding evidence of payments made to the injured worker by a collateral source and the identity of that collateral source. Finally, defendants maintain that the trial court held them to a higher standard of care than required by the governing law. For the reasons set forth below, we affirm the judgment of the district court.
 
 I. Procedural History
 
 2
 Plaintiff Harrell E. Morlan was severely injured when he was electrocuted while working on an electrical transformer owned by defendant Green River Steel Corporation ("Green River"). Plaintiff is an employee of PPM, Inc. of Georgia ("PPM"). Green River contracted with PPM to remove, transport and dispose of PCB-containing oils from electrical transformers located in Green River's steel mill in Owensboro, Kentucky. Plaintiff and his wife, co-plaintiff Betty J. Morlan, sued Green River and its parent corporation Athlone Industries, Inc. alleging that Green River's negligence caused plaintiff's injuries. Green River denied liability and filed a third-party complaint against PPM alleging that it was PPM's negligent or willful acts which had caused the injuries and that it was entitled to indemnification under their agreement. PPM denied liability and counterclaimed for indemnification under the same agreement.
 
 
 3
 On July 2, 1991, the district court granted United States Pollution Control, Inc. ("USPCI"), the parent of PPM, leave to file an intervening complaint. USPCI alleged a right of indemnity under KRS Sec. 342.700 for money paid as a result of Morlan's injuries. USPCI sought $84,392.84, which represented the amount it had paid for medical and hospital bills incurred by Morlan; and $86,343.60 it had paid in settlement of a South Carolina workers' compensation action Morlan filed against USPCI for permanent impairment. USPCI also sought reimbursement for any amounts it might be required to pay as a result of a complaint filed against it by the State Insurance Fund of Oklahoma seeking indemnity for the $96,678.06 the fund had paid in workers' compensation benefits to Morlan.
 
 
 4
 A jury trial began on March 2, 1992 before the Honorable Eugene E. Siler, sitting by special designation. On March 6, 1992, the jury returned its verdict. It found Green River to be 100% at fault for Morlan's injuries. In a special interrogatory, the jury found neither Morlan nor PPM to have been negligent. The jury awarded Mr. Morlan the following:
 
 
 5
 For mental and physical suffering: $1,000,000.00
For lost income or wages: $ 52,500.00
For permanent impairment to earning power: $1,089,435.20
For hospital, medical, rehabilitation and prosthetic services: $ 197,391.43
For future hospital, medical, rehabilitation and prosthetic $ 119,000.00
 services:
 
 
 6
 It awarded Mrs. Morlan $100,000.00 for the loss of services, assistance, aid, society, companionship and conjugal relationship due to the injuries sustained by her husband. The trial court subsequently entered a judgment incorporating the jury's verdict, granting PPM's counterclaim and dismissing Green River's third-party complaint. Green River was also ordered to pay the following amounts to USPCI:
 
 
 7
 For payments made to plaintiff for lost wages: $45,500.00
For settlement of the South Carolina workers' compensation claim: $86,343.60
For medical benefits paid: $88,897.57
 
 
 8
 The district court reduced plaintiff's jury award by the amount of USPCI's award.[2] On May 12, 1992, Green River appealed the judgment.[3]
 
 
 9
 On May 19, 1992, the Morlans agreed to indemnify USPCI for any judgments that might be rendered against it in the Oklahoma workers' compensation action. Civil Docket, Entry 138, Joint Appendix, p. 11.
 
 II. Factual Background
 
 10
 Green River owned and maintained two high-voltage transformers within the electrical substation at its Owensboro, Kentucky steel mill. In November 1985, due to financial difficulties, Green River was forced to shut the mill down for approximately three and a half years. During this period, the transformers were not in operation. While the mill was shut down, a new power plant was built nearby. The electrical current coming from the new facility matched that needed by the equipment used in the mill. Hence, the transformers had become obsolete.
 
 
 11
 In the spring of 1988, Green River began preparing to reopen the mill. It decided that it would take the transformers permanently out of service. The option of bypassing the transformers by running the power cables underground was rejected as too lengthy and costly a process. Green River instead placed a junction box on top of the transformers as a method of bypass. Although the transformers were de-energized, the connections to the junction box and the box itself were energized with between 8,000 and 13,800 volts of electricity. The bypass was complete in June of 1988.
 
 
 12
 At about the same time, Green River learned that the oil in these transformers contained elevated levels of PCBs and decided to remove the oil in accordance with Environmental Protection Agency ("EPA") regulations. On July 25, 1988, Green River contracted with PPM to remove, decontaminate and dispose of the oil.
 
 
 13
 On August 22, 1988, plaintiff arrived at the mill to begin the removal process. Hollis Collier was Green River's designated contact person for the project. After speaking with James Bruton, the mill's chief electrical supervisor, Collier was under the mistaken impression that there was no power running to the transformers. Collier was unaware of the live current running through the junction boxes on the top of the transformers. Morlan informed Collier that the transformers would have to be vented before he could begin the removal process. Morlan asked Collier several times whether or not the transformers were de-energized; Collier assured him that they were. Collier climbed a ladder to the top of a transformer to vent the transformer. When he had difficulty locating a place to vent, he requested that Morlan climb up to assist him. While on top of the transformer, Morlan came into contact with live current and was severely burned.
 
 III. Contractor Status
 
 14
 The parties do not dispute that Morlan is an employee of PPM entitled to benefits under Kentucky's Workers' Compensation Act. See KRS 342.640. It is also not disputed that PPM has insured its liability for compensation to Morlan under Kentucky's Workers' Compensation Act. Consequently, the exclusive remedy provisions of Kentucky's Workers' Compensation Act bar a civil action against Morlan's employer, PPM. KRS 342.690(1) provides:
 
 
 15
 If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee.... For purposes of this section, the term "employer" shall include a "contractor" covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact, secured the payment of compensation.
 
 
 16
 Green River's liability to Mr. Morlan will also be limited to the amount paid under the Workers' Compensation Act by PPM if Green River can establish that it holds the status of a "contractor". KRS 342.610(2) provides:
 
 
 17
 A contractor who subcontracts all or any part of a contract ... shall be liable for payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment.... A person who contracts with another ... to have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation or profession of such person, shall for the purposes of this section be deemed a contractor, and such other person a subcontractor....
 
 
 18
 The statute makes its plain that if Green River is a contractor, it has no liability in tort to an injured employee of its subcontractor, PPM. It is also clear from the statute that Green River is a contractor if the work subcontracted to PPM is of a kind which is a regular or recurrent part of the work of the trade. See Fireman's Fund Ins. Co. v. Sherman & Fletcher, 705 S.W.2d 459 (Ky.1986).
 
 
 19
 At the close of plaintiff's evidence, Green River moved for a directed verdict based on the exclusive remedy provisions of Kentucky's Workers' Compensation Act. The motion was denied because Green River did not meet the statutory requirements necessary to be considered a "contractor." Green River renewed its motion for judgment as a matter of law in a post-trial motion which was also denied. The trial court ruled that Morlan's employer PPM did not contract with Green River to do work which is a regular or recurrent part of Green River's business and that Green River was, therefore, not a contractor.
 
 
 20
 In the proceedings below, Green River took the position that the issue of its status as a contractor was one of fact which must be decided by the Court. See Trial Brief, p. 4, Joint Appendix, p. 85. The trial court's factual findings must be upheld unless clearly erroneous. Waxman v. Luna, 881 F.2d 237, 240 (6th Cir.1989). A finding of fact is clearly erroneous when, although there is evidence to support it, " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)); accord Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co., 990 F.2d 865, 870 (6th Cir.1993).
 
 
 21
 Green River cites several cases in an effort to demonstrate that the "regular or recurrent" requirement of KRS 342.610(2) is broad enough to embrace the work which PPM had contracted to perform for Green River. However upon analysis these cases are all distinguishable from the present case.
 
 
 22
 In Silvers v. Martin Cty. Coal Corp., 849 F.2d 1473, 1988 WL 66139, 1988 U.S.App. LEXIS 8871 (6th Cir. June 28, 1988), the coal company defendant routinely replaced aluminum siding on its buildings as part of its maintenance program. Deciding to replace the siding on all of the buildings at one time, the company hired an outside contractor. During the replacement process the plaintiff, an employee of the outside contractor, came into contact with high tension wires and was injured. Finding that the replacement of the aluminum siding was a regular or recurrent aspect of the coal company's maintenance program, the court stated:
 
 
 23
 MCCC employs a seven- or eight-man maintenance crew which usually replaces any damaged or deteriorated siding in the normal course of maintenance on its buildings. Although not a task the crew frequently performs, it has often replaced corrugated metal siding in the past.
 
 
 24
 Id. at * 1, 1988 U.S.App. Lexis at * 2 (emphasis added).
 
 
 25
 Comperry v. Phelps Dodge Indus., Inc., Case No. 90-5824, 1991 WL 39660, 1991 U.S.App. LEXIS 5069 (6th Cir. March 21, 1991) involved a wire manufacturer who had hired plaintiff's employer to perform welding on devices used in the manufacturing process. Although two full-time employees of the defendant manufacturer performed welding as often as twice a week, an outside contractor was hired due to the amount of welding to be performed. Finding no genuine issue as to whether the welding was a "regular or recurrent" part of the defendant's business, the court explained that:
 
 
 26
 The record was filled with evidence that welding was recurrent. Not only must retorts generally be welded as a matter of maintenance of an annealing line, but that these particular retorts had been repeatedly welded.
 
 
 27
 Id. at * 4, 1991 U.S.App. Lexis 5069 at * 13-14 (emphasis added).
 
 
 28
 Additional cases cited by Green River have relied primarily on the routine nature of the work when determining that it was "regular or recurrent." In Granus v. North American Philips Lighting Corp., 821 F.2d 1253 (6th Cir.1987), ruling that the work was routine maintenance such that plaintiff's claim was barred by the Kentucky Workers' Compensation Act, the court found it "undisputed that firebricks must be replaced periodically as an ordinary part of plant maintenance." Id. at 1257. Accordingly, the court concluded, such work constituted a regular or recurrent part of the defendant's business.
 
 
 29
 Likewise, Sublett v. Tennessee Valley Authority, 726 F.Supp. 1077, 1078 (W.D.Ky.1989), involved an injury to the employee of an outside contractor which occurred while the employee was repairing a damaged conveyor belt. Finding that the owner "regularly performs most of the contracted conveyor belt repair work directly through its own employees," the district court concluded that the repair work in which the plaintiff was engaged when injured constituted a regular or recurrent aspect of the coal company's trade. Id.
 
 
 30
 In the instant case, PPM contracted with Green River to transport, detoxify and dispose of 9,400 gallons of PCB contaminated oil. The transformers had been de-energized for several years. The oils were being drained for the one-time purpose of permanently shutting down the transformers. Hence, the work PPM was contracted to perform cannot be described as routine operational maintenance. PPM's work was to be conducted according to EPA regulations. Green River was not qualified to transport and dispose of contaminated oil. The trial court's finding that the draining, transport and disposal of PCB contaminated oil from its electrical transformers was not a regular or recurrent part of Green River's business and that Green River did not qualify as a contractor under the provisions of KRS 342.610(2) is not clearly erroneous.
 
 IV. Employer Status
 
 31
 Green River contends that even if it failed to fit the definition of a statutory contractor, it was nevertheless a statutory employer. According to Green River, Morlan was its "loaned servant" at the time of his injury.
 
 
 32
 Normally, a corporation which contracts with an independent contractor to do work on the corporation's own premises is considered a third party rather than an employer for purposes of Kentucky's workers' compensation statute. Brown v. Tennessee Gas Pipeline Co., 623 F.2d 450, 452 (6th Cir.1980). However, the corporation can become the "employer" of its independent contractor's employees where the corporation establishes a master/servant relationship with those employees. This "loaned servant" relationship exists where all of the following conditions are met:
 
 
 33
 (a) the work being done is essentially that of the special employer, (b) the special employer has the right to control the details of the work, and (c) the employee has made a contract of hire, expressed or implied, with the special employer.
 
 
 34
 Smith Concrete, Inc. v. Mountain Enterprises, Inc., 833 S.W.2d 808, 812 (Ky.1992) (citing M.J. Daly Co. v. Varney, 695 S.W.2d 400, 402 (Ky.1985) (citing Larson, The Law of Workman's Compensation, Sec. 48 (1983))).
 
 
 35
 In deciding whether or not a corporation has exercised sufficient control over its independent contractor's employees so as to render them loaned servants of the corporation, courts look to determine whether the corporation exercised control "as to the means, or as to the mode, manner and details of the performance of the work." Brown, 623 F.2d at 453-54 (citing King v. Shelby Rural Electric Cooperative Corp., 502 S.W.2d 659, 664 (Ky.Ct.App.1973), cert. denied, 417 U.S. 932 (1974)). See also United Engineers & Constructors, Inc. v. Branham, 550 S.W.2d 540 (Ky.1977); Allied Machinery, Inc. v. Wilson, 673 S.W.2d 728, 730 (Ky.Ct.App.1984).
 
 
 36
 The agreement between Green River and PPM provides that PPM is an independent contractor who "shall have and maintain complete control over all of its employees, agents, and operations." Nothing in the record shows that Green River or its employees had the right to control the details of Morlan's work. Green River hired PPM for its expertise. There is no evidence that Green River dictated to Morlan the manner in which he was to accomplish his work. Collier was the only employee of Green River who had contact with Morlan and he did not direct Morlan's efforts. At the time of the injury, Morlan was voluntarily responding to Collier's request for help in finding a place to vent the transformer. There is no evidence that Green River exercised control over Morlan's work so as to render him a loaned servant of Green River.
 
 
 37
 The contract between Green River and PPM states that no employee of PPM is to be considered an agent, representative, employee or servant of Green River. Under Kentucky law, parties are free to contract regarding their status for workers' compensation purposes. In M.J. Daly Co. v. Varney, 695 S.W.2d 400, 401 (Ky.1985), the plaintiff Varney was an employee of a labor service company who was working on the premises of M.J. Daly Co. M.J. Daly had contracted with Varney's employer to provide workers' compensation for those employees sent to work on M.J. Daly premises. When Varney subsequently brought suit against M.J. Daly for injuries he sustained on the premises, M.J. Daly raised the defense of employer immunity. Rejecting defendant's argument that Varney was a loaned servant of M.J. Daly regardless of the parties' intent, the Kentucky Supreme Court said:
 
 
 38
 [I]n a free enterprise system the right of a business to utilize a labor services company and contract with that company to assume the responsibilities of being the employer, including responsibility for providing workers' compensation coverage, should be recognized.
 
 
 39
 On the other hand, such election carries with it the concomitant responsibility of common law liability for damages in a tort action to a person who can prove negligence caused his injury. KRS 342.700(1) sets out the remedies when a third party is legally liable. By so contracting as to avoid employer status and the responsibilities that go with such status, M.J. Daly Co. retained third party status and the legal liability that goes with it.
 
 
 40
 Id. at 403 (emphasis added).
 
 
 41
 According to the terms of its contract with PPM, Green River expressly chose to remain a third party and not become an employer. Thus, it retained third party status and the legal liability that goes with it. The trial court correctly found that Morlan was not Green River's loaned servant.
 
 V. Collateral Source Payments
 
 42
 Green River also claims that the trial judge committed reversible error by failing to allow evidence of disability payments made by USPCI to Morlan while he was off work. Green River contends on appeal that these payments constituted collateral source payments, evidence of which should have been admitted at trial. See KRS 411.183(3). Green River also contends that USPCI was not properly identified as the source of these payments. Id.
 
 
 43
 We find that the appellant waived these claims by failing to raise them in the court below. Federal Deposit Ins. Corp. v. Binion, 953 F.2d 1013, 1018 (6th Cir.1991); Sun Refining & Marketing Co. v. Brennan, 921 F.2d 635, 638 (6th Cir.1990); Bannert v. American Can Co., 525 F.2d 104, 111 (6th Cir.1975), cert. denied, 426 U.S. 942 (1976); Colonial Refrigerated Transp., Inc. v. Mitchell, 403 F.2d 541, 552 (5th Cir.1968). During the trial, it was the position of PPM/USPCI and Morlan that the payments made to Morlan while he was off work were a form of disability payments and not a continuation of Morlan's salary. Counsel for Green River, Mr. Helmers, disagreed and argued that these payments were not collateral source payments but were a continuation of Morlan's regular salary, thus excluding his claim for lost wages. At a bench conference on the issue, Green River's counsel stated the following:
 
 
 44
 MR. HELMERS: Your Honor, that's not the facts that's come in so far. He testified he never applied for worker's comp in his--in his deposition.
 
 
 45
 He testified here today he was paid $750 a week. W-2 forms and pay stubs took out Social Security, everything else, during this period of time.
 
 
 46
 And it's not a collateral source if you're withholding Social Security, taxes and everything else. If it's in lieu of it, it's insurance or worker's comp, it's not subject to taxation or Social Security.
 
 
 47
 They did not pay it. They paid him salary, and I've got a right to bring that in if they're going to claim lost wages.
 
 
 48
 Bench Conference, Joint Appendix, p. 13 (emphasis added). Hence, the issue raised by Green River during trial was not whether the payments made by Morlan's employer were admissible as collateral source payments. The only issue raised by Green River was whether these payments were a continuation of Morlan's salary instead of a disability benefit provided by his employer.
 
 
 49
 Green River established the following by avowal: Morlan ordinarily did not receive a flat salary but was paid a certain minimum amount plus additional compensation depending upon the number of miles he drove. Morlan testified that his earnings averaged about $750.00 per week before the accident. During the 70 weeks that he was off work, he received a flat payment of $650.00 per week--the same amount paid him while on vacation or sick leave. Transcript of Morlan Testimony, pp. 465-501, Joint Appendix, pp. 174-180. The trial court properly concluded that these payments were not a continuation of Morlan's salary but a benefit provided by his employer. Green River does not contest that determination in this appeal.
 
 
 50
 The record before us does not demonstrate that Green River ever asked the trial court to admit evidence of these payments as collateral source payments or to identify USPCI as their source pursuant to KRS 411.183(3). Indeed, such a request would not likely have been made by Green River since it maintained throughout trial that these payments were not collateral source payments.
 
 
 51
 Green River also objects to the trial court's having distributed to USPCI part of the jury's award for lost wages where USPCI was never identified as holding a subrogated claim. We find that Green River was not prejudiced by the trial court's actions. Morlan was entitled to recover from Green River the income which he lost during the time he was off work. Accordingly, the trial court let the jury determine the amount of his lost income. The jury found that he was entitled to receive $52,500, representing $750 per week X 70 weeks. After the jury returned its verdict, the trial court entered a judgment in which it gave $45,500 of these lost wages to USPCI, apparently reflecting the amount of money paid by USPCI to Morlan during the 70 weeks he was off work. Morlan was clearly entitled to recover the entirety of his lost wages from Green River pursuant to the jury's verdict. The fact that the trial judge subsequently gave the bulk of these funds to USPCI in no way prejudiced Green River. The only party who might be prejudiced by this action would be Mr. Morlan and he has not objected.[4] Green River has no standing to challenge the trial court's distribution of Morlan's lost wages.
 
 VI. Standard of Care
 
 52
 Finally, Green River argues that the district court erred in instructing the jury that Green River was required to exercise "the highest degree of care" in relation to Morlan. It asserts that only utility companies are subjected to this standard of care.
 
 
 53
 While the Kentucky cases establishing the level of care required by those who maintain high voltage electrical lines do involve utility companies as defendants in wrongful death or personal injury actions, the language of the decisions does not limit the standard to utility companies:
 
 
 54
 In constructing and maintaining electrical lines the highest degree of caution must be exercised for the protection of all persons at places where they have a right to go, because in dealing with so deadly an instrumentality the highest degree of care and skill known in the conduct of such business to prevent injury to such persons is required.
 
 
 55
 Vaught's Adm'x v. Kentucky Utilities Co., 296 S.W.2d 459, 461 (Ky.Ct.App.1956). In Troutman v. Int'l Harvester Co., 83 F.Supp. 501, 504 (W.D.Ky.1948) (quoting Green River Rural Electric Co-op. Corp. v. Blandford, 206 S.W.2d 475, 477 (Ky.Ct.App.1947)), aff'd, 173 F.2d 895 (6th Cir.), cert. denied, 337 U.S. 940 (1949), this standard of care was applied to a non-utility company:
 
 
 56
 There is no dispute as to the high degree of duty on the part of one maintaining a high voltage electric line. About the only thing certainly known about electricity is its highly dangerous character and that the greater the voltage the greater the danger. So the duty as often declared is, in short, to exercise the utmost care to prevent injury, which, however, is but to say that ordinary care in dealing with so dangerous a force is the highest degree when put into practice.
 
 
 57
 Given that Green River maintained an electrical line carrying 8,000-13,800 volts of electricity, the trial court did not err in holding Green River to this standard of care.
 
 VII.
 
 58
 For all of the foregoing reasons, we AFFIRM the decision of the district court.
 
 
 
 [1]
 The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [2]
 In the court's final judgment, plaintiff was awarded the following:
 For mental and physical suffering: $1,000,000.00
For lost income or wages: $ 7,000.00
For permanent impairment to earning power: $1,003,091.60
For hospital, medical, rehabilitation and prosthetic services: $ 108,493.86
For future hospital, medical, rehabilitation and prosthetic $ 119,000.00
 services:
 
 
 [3]
 Green River subsequently dismissed its appeal against Harrell E. and Betty J. Morlan. Consequently, they are no longer parties to this case
 
 
 [4]
 Although the record does not reflect it, it seems likely that this was part of the agreement referenced in the agreed order entered on May 19, 1992. See Civil Docket, Entry 138, Joint Appendix, p. 11