Michael GESLER, et al., Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

No. CIV.A.3:99CV–464–S.

United States District Court,
W.D. Kentucky,
at Louisville.

July 6, 2001.

Opinion Denying Reconsideration
Aug. 23, 2001.

1521, 1524–26 (11th Cir.1994); *Ivy Club v. Edwards,* 943 F.2d 270, 284 (3d Cir.).

Bill V. Seiller, Seiller & Handmaker, Lousiville, KY, Allen Carl Platt, III, Lorch & Naville, New Albany, IN, for plaintiffs.

Michael D. Ekman, Benjamin Seth Schecter, Pedley, Zielke & Gordinier PLLC, Bryan Todd Thompson, Sallie Jacobs Stevens, Thompson & Miller, Louisville, KY, for defendant.

## MEMORANDUM OPINION

SIMPSON, Chief Judge.

This matter is before us for consideration of the motion for summary judgment filed by the defendant, Ford Motor Company ("Ford"). The motion having been thoroughly briefed, it is now ripe for review.

## BACKGROUND

The factual background relevant to Ford's motion is largely undisputed:

1. During the summer of 1998, Ford retained TKS Industrial Company ("TKS") to demolish, remove, and replace the Phosphate/E–Coat System ("E–Coat System") located at Ford's Louisville Assembly Plant ("LAP").

2. The E–Coat System prevents automobile body corrosion through the treatment of partially assembled vehicles with phosphate and "E–Coat." The E–Coat System at the LAP was installed in 1973 and had never been replaced or

significantly revised until its destruction and removal in 1998.

3. The E–Coat System was replaced with a new system which featured a "dip method" of rustproofing automobile frames as opposed to the "spray method" utilized by the system that it replaced.

4. While Ford never replaced or significantly revised its E–Coat System at the LAP between 1973 and 1998, several of Ford's other automobile production facilities have undergone similar replacements or revisions in the last several years.

5. Ford's recent replacement or significant revision of E-coat Systems at its automobile production facilities is driven by a number of factors including competition within the automotive industry, government regulation, changes in technology, changes in vehicle design, and the age of the system being replaced or significantly revised.

6. The plaintiff, Michael Gesler ("Gesler"), was employed by TKS as a supervisor and oversaw various aspects of the demolition and removal of Ford's E–Coat System at the LAP in 1998.

7. On or about July 2, 1998, in connection with the E–Coat System demolition and removal, one of Ford's employees spilled a quantity of glacial acetic acid, a substance that is "corrosive and irritating to the mucosa and soft tissue of the eyes, mouth and pharyngeal areas, bronchi and lungs." Pls.' Resp., Ex. C at 1 (DN 51).

Gesler claims that he was injured when he was exposed to the glacial acetic acid that was spilled by Ford's employee. Gesler's wife, Carolyn, claims she was injured as a result of the loss of her husband's consortium. The plaintiffs brought suit against Ford in Jefferson Circuit Court, and Ford subsequently removed the suit to

this court pursuant to 28 U.S.C. §§ 1332 and 1441.

In support of its motion for summary judgment, Ford argues that in retaining TKS to demolish and remove the LAP's E–Coat System, it acted as a "contractor" within the meaning of Kentucky's Workers' Compensation Act. See Ky.Rev.Stat. Ann. § 342.610(2) (Michie 1997). If Ford was a contractor within the meaning of KRS § 342.610(2), then pursuant to KRS § 342.690(1) its liability to the plaintiffs for their alleged injuries is limited to the payment of workers' compensation benefits. However, the plaintiffs contend that Ford did not act as a contractor and that, therefore, they may maintain an action at law against Ford for their injuries.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). According to the Supreme Court, the standard is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Faced with a motion for summary judgment, the nonmovant must come forth with requisite proof to support its legal claim, particularly where the opposing party has had an opportunity to conduct discovery. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In the Sixth Circuit, "[t]he mere possibility of a factual dispute is not enough." Mitchell v. Toledo Hosp., 964 F.2d 577, 582

(6th Cir.1992) (quoting *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)). "[T]his standard requires a court to make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than *de minimis.*" *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996).

## DISCUSSION

KRS § 342.690 states that "[i]f an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive...." The statute also provides that "[f]or purposes of this section, the term 'employer' shall include a 'contractor' covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact, secured payment of compensation." KRS § 342.610 defines "contractor" as "[a] person who contracts with another: ... (b) to have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person."

■ At issue in this case is whether or not Ford fits under the definition of "contractor" set forth in KRS § 342.610(2). Given the above definition, Ford acted as a contractor in hiring TKS if it contracted with TKS to have work performed of a kind which is a *regular or recurrent* part of Ford's business of designing, manufacturing, and selling automobiles.

■ Statutory construction begins with an undefined term's plain meaning. *See Commonwealth v. Allen,* 980 S.W.2d 278, 280 (Ky.1998). The plain meaning of "regular" contemplates some sort of routine. *See Daniels v. Louisville Gas and Elec. Co.,* 933 S.W.2d 821, 824 (Ky.App.1996) (" 'Regular' generally means customary or normal, or happening at fixed intervals."). " 'Recurrent' simply means occurring again or repeatedly." *Id.* While "neither term requires regularity or recurrence with the preciseness of a clock or calendar," *see id.,* it is clear that the terms do not encompass "one-time project[s]." *Sharp v. Ford Motor Co.,* 66 F.Supp.2d 867, 869 (W.D.Ky.1998).

Courts which have considered whether various types of work are regular or recurrent parts of a purported contractor's trade or business have relied most heavily on how frequently that work must be performed. For example, in *Granus v. North American Philips Lighting Corp.,* 821 F.2d 1253 (6th Cir.1987), the court concluded that the work of replacing bricks which line glass furnaces at glass factories was a regular or recurrent part of the defendant's business because relining was necessary "periodically as an ordinary part of plant maintenance." *Id.* at 1257. In contrast, the court in *Morlan v. Green River Steel Corp.,* 35 F.3d 566 (Table), 1994 WL 502655 (6th Cir.1994), agreed with the district court's conclusion that the removal and disposal of contaminated oil from an "obsolete" transformer was not "routine operational maintenance" and that the work was being done "for the one-time purpose of permanently shutting down the transformers." *See id.* at *5. As a result, the court found that the work was not a regular or recurrent part of the defendant's business. *See id.*

These two decisions illustrate the general reluctance of courts to find that work is a regular or recurrent part of a defendant's business when that work is not a routine aspect of that business. *See Decker v. Ford Motor Co.,* No. 3:92CV 637 S, slip op. at 3 (W.D.Ky. Nov. 13, 1995) (relying on evidence that "Ford's tooling must periodically be replaced, often annually," in granting Ford's motion for summary judgment); *Sharp,* 66 F.Supp.2d at 869 (granting Ford's motion for summary judgment after finding that loading and unloading vehicles "was not a one-time project");

*Thompson v. The Budd Co.,* 199 F.3d 799, 805 (6th Cir.1999) ("[S]ection 342.610 encompasses regular maintenance of manufacturer's physical plant as well as activities required to conform with applicable governmental regulations."); *Daniels,* 933 S.W.2d at 824 ("Although the testing may not be regular in the sense that it is not a task which is performed frequently, ... it nevertheless is a regular or certainly a recurrent part of LG & E's business and, in fact, mandated by the EPA whenever LG & E installs or upgrades its pollution control equipment.").

As noted above, the parties agree that the demolition, removal, and replacement of the E–Coat System does not occur regularly or recurrently at Ford's LAP or at any other of Ford's automobile production facilities. *See* Def.'s Suppl. Reply, Ex. 1, Herzberg Dep., at 17; Pls.' Resp., Ex. F, Affidavit of Dr. Bertelson, at 2. Considering Ford's automobile production facilities collectively, however, Ford contends that E–Coat System replacement has occurred frequently in the last fifteen years. *See* Def.'s Reply, Ex., Herzberg Affidavit, at ¶¶ 13, 14 (stating that Ford installed new E–Coat Systems at twenty of its twenty-two North American facilities between 1985 and 1999).

The record indicates that the development of a superior automobile rustproofing system and the associated competitive pressure to implement that system quickly led Ford to overhaul its production facilities in recent years. *See* Herzberg Dep. at 12–13. If the LAP project is typical of its other recent E–Coat System replacements, then each project cost approximately $50 million, took two to three years to plan and eighteen months to complete, and, barring any unforeseen technological developments, could be productive for the next twenty-five to thirty years. *See* Herzberg Dep. at 13, 17–19, 33; Pls.' Resp., Ex. A, McMaster Dep. at 7. Given the large scale

of Ford's E–Coat System demolition and replacement, the infrequency with which Ford's production facilities experience E–Coat System revision or replacement, the plain meaning of "regular" and "recurring," and the interpretation given by courts to KRS § 342.610, we cannot say that as a matter of law, Ford acted as a contractor in hiring TKS. Therefore, Ford's motion for summary judgment will be denied.

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment will be denied. A separate order will be entered this date in accordance with this opinion.

## *MEMORANDUM OPINION*

This matter is before the Court on the motion of the Defendant, Ford Motor Company ("Ford"), to reconsider our order denying its motion for summary judgment. For the reasons set forth below, we will deny this motion be separate order entered this date.

## *FACTS and PROCEDURAL HISTORY*

This case arises out of an accident which allegedly occurred during the demolition and replacement of the Phosphate/E–Coat System ("E–Coat System") at Ford's Louisville Assembly Plant ("LAP"). The relevant facts are detailed in our previous memorandum opinion regarding Ford's motion for summary judgment. In that order, we rejected Ford's argument that it acted as a "contractor" within the meaning of Kentucky's Workers' Compensation Act. *See* Ky.Rev.Stat. Ann. § 342.610(2) (Michie 1997). The specific issue was whether the demolition and replacement of the E–Coat System was a "regular or recurrent part" of Ford's work. We found that Ford was

not entitled to summary judgment on that issue.

Ford has moved to reconsider our ruling citing two cases which it contends we did not fully address: *Fireman's Fund Insurance v. Sherman & Fletcher*, 705 S.W.2d 459 (Ky.1986) and *Daniels v. Louisville Gas and Elec. Co.*, 933 S.W.2d 821 (Ky. App.1996). It claims that these cases demonstrate that even infrequent, large scale projects are considered to be regular and recurring parts of one's business so long as the work would occur again at fixed intervals.

## DISCUSSION

 Motions for reconsideration are extraordinary in nature and so should only be granted sparingly. *Plaskon Electronic Materials v. Allied–Signal*, 904 F.Supp. 644, 669 (N.D.Ohio 1995)(citing *In Re August, 1993 Regular Grand Jury*, 854 F.Supp. 1403, 1406 (S.D.Ind.1994) and *Bakari v. Beyer*, 870 F.Supp. 85, 88 (D.N.J. 1994)). There are three basic situations in which a court will reconsider its order: 1) there has been an intervening change in the controlling law, 2) there is new evidence which has become available, and 3) there is a need to correct clear legal error or to prevent manifest injustice. *Id.* (citing *Bermingham v. Sony Corp. of America, Inc.*, 820 F.Supp. 834, 856 (D.N.J. 1992)). The court, in order to promote finality of decisions and judgments, should not consider such a motion when the moving party merely disagrees with the court's decision and attempts to reorganize and refocus its previous evidence and legal analysis. *Id.*

In this instance, Ford does not cite a change in the law or new evidence. Although this motion appears to be a reorganization and refocusing of its legal analysis, we note that Ford argues, essentially, that we have committed clear legal error. We disagree.

In *Sherman & Fletcher*, the accident victim was an employee of a subcontractor engaged to do framing work on a large construction project. 705 S.W.2d at 460. The court found, "the business or occupation of [the defendant] was building construction, and rough carpentry is work of a kind which is a regular or recurrent part of the work of the business of building construction." *Id.* at 462. In other words, *Sherman & Fletcher* stands for the rather straight-forward proposition that building contractors regularly require rough carpentry work in framing the buildings they construct.

The analogy to this case, however, does not hold up. Ford is engaged in the business of manufacturing and selling automobiles. This process included an E–Coat System to protect the automobiles from rust. Thus, a person engaged in the process of "E–Coating" automobiles, whether employed by Ford or a subsidiary, would probably be engaged in a regular or recurring part of Ford's business. However, the Plaintiffs were employed to demolish the outdated E–Coat System and to help construct a replacement system. Ford did not demonstrate to our satisfaction that this specific activity was a regular or recurring part of its business.

Similarly, *Daniels* is distinguishable. In *Daniels*, the plaintiff was employed by a subcontractor to conduct emissions testing on LG & E's coal-fired generators as required by the EPA. 933 S.W.2d at 822. In holding that this work was regular and recurrent, the court focused primarily on the fact that the EPA mandated that it be done each time that LG & E installs or upgrades its pollution control equipment. *Id.* at 823–24. Also, that testing had been conducted *on the same facility* ten times in less than thirty years. *Id.* at 823. This particular E–Coat System at Ford had not been replaced or significantly revised for

fifteen years, and its demolition and replacement is not required by law.

## CONCLUSION

For the reasons stated, we will deny Ford's motion to reconsider by a separate order entered this date.