AMBROSIUS INDUSTRIES, Inc., et al.,
Appellants,

v.

Oley ADAMS et al., Appellees.

HOLLOWAY READY MIX COMPANY,
Inc., Appellants,

v.

Oley ADAMS et al., Appellees.

Court of Appeals of Kentucky.

July 10, 1956.

Rehearing Denied Sept. 21, 1956.

**232**

of the plant, but there is a sharp conflict in the contentions of the parties as to whether he was to supervise the entire operation or was merely to assemble the plant. The Holloway Company rented a crane, with an operator and an assistant called an "oiler," from Ambrosius Industries, Inc., for the purpose of lifting various parts of the plant into position. During the course of erecting the plant a choker cable used in the lifting operation broke and Adams was thrown to the ground and received serious injuries.

Adams brought an action against both the Holloway Company and the Ambrosius Company. Judgment on a jury verdict was entered in favor of Adams against the Holloway Company for $25,000 and against the Ambrosius Company for $50,000. Both defendants moved to have the verdict set aside and judgment entered for the defendants, and in the alternative for a new trial. The learned judge, Lawrence S. Grauman, denied these motions in a very extensive and well considered opinion. Both defendants appeal from the judgment.

The Holloway Company contends that (1) it was not negligent; (2) even if it were negligent, its negligence was not the proximate cause of the accident; (3) Adams was guilty of contributory negligence; (4) the trial judge erred in his instructions to the substantial prejudice of the Holloway Company; (5) the damages awarded were excessive; (6) there was misconduct on the part of certain jurors on voir dire examination; (7) it was either entitled to have a directed verdict on its cross-claim for indemnity against the Ambrosius Company or it was entitled to have the issue submitted to the jury; and (8) the Ambrosius employes were not the "loaned servants" of the Holloway Company.

The Ambrosius Company contends that (1) the operator and oiler of the crane were "the loaned servants" of the Holloway Company; (2) the trial court erred in refusing to admit certain evidence as to cus-

Marshall P. Eldred, William G. Hume, Louisville, for Ambrosius Industries, Inc.

James U. Smith, Jr., Leon Seidman, Louisville, for Holloway Ready Mix Co.

Arthur W. Grafton, Ed P. Jackson, Louisville, for Oley Adams, et al.

CULLEN, Commissioner.

The Holloway Ready Mix Company purchased from the C. Watson Company a plant for batching or mixing concrete. Pursuant to their agreement the latter sent an employee, Oley Adams, to the job location. Adams was to assist in the assembly

toms of the trade when this type of equipment is rented; and (3) the instructions on "loaned servant" were erroneous.

The briefs in this case are extensive and the record is voluminous. There is vigorous argument as to what were the duties of the parties. Each contends that the others were serving in supervisory capacities. At the outset we think it should be noted that the assembly and erection of this plant were to be achieved through the cooperative efforts of the parties. This is apparent from the manner in which the entire operation was handled. Mears (the crane operator) exercised control over the operation of the crane. Adams assembled the batcher. Gene Holloway was there to coordinate the activities and to insure that the results were satisfactory to his company.

The batcher is comprised of four legs or columns 18 feet in height, a bin weighing 7,411 pounds and a hopper. On the morning of the injury, Mears, the operator, and Hall, the oiler, arrived with their crane at the site where the batcher was to be erected. Upon arrival Mears found that the hopper and bin had been bolted together. Mears immediately told Gene Holloway that he could not lift both the hopper and the bin together. Holloway proceeded to disassemble the hopper and bin, while Adams, Mears and Hall erected the legs upon the concrete foundations which had previously been emplaced. Adams then went to his truck to get some tools. While he was gone, Gene Holloway either took from the crane or had handed to him by someone from the crane two choker cables ½ inch in width. With these he rigged the bin. The bin was rigged in such a manner that one of the choker cables ran through a loop on the other. Expert witnesses testified that when rigged in this manner, all of the weight is placed upon the one cable at the point of contact with the other. It was the opinion of the experts that the cable broke at this point. Several experts also testified that the rigging was done in an improper man-

ner and that ¾ inch cables should have been used; and that where the cable was bent around the corners of the bin, it should have been padded in some manner to prevent the metal cables being in contact with the metal bin and to lessen the sharpness of the bend in the cable. Gene Holloway testified that he had never done any work of this kind and knew nothing about it.

After being rigged, the bin was lifted into position above the legs. At this point Adams returned from his truck and proceeded to climb the legs and bolted one corner of the bin to one of the legs. He then experienced difficulty in aligning the holes at another corner of the bin with the holes in the leg. He thereupon signaled to Mears to move or shift the bin so that he could align these holes. When or shortly after the bin was moved, the choker cable broke and Adams was thrown to the ground.

It is argued that since Mears and Adams had superior knowledge, experience and skill, and they were on the job for that reason, it was incumbent upon them to notice the situation and they were charged with knowledge of the probable consequences. Therefore, applying the rule of Jump v. Ashland Oil Co., Ky., 259 S.W.2d 12, since Holloway had no knowledge of the dangers involved and Adams and Mears had knowledge, Holloway could not be negligent. This argument fails to distinguish between a lack of knowledge on the part of Gene Holloway as to how a load should be rigged and the knowledge chargeable to him that if a load is improperly rigged, it creates a dangerous situation. There is certainly substantial evidence to sustain a finding that Gene Holloway rigged the bin in a negligent manner. Undertaking to rig such a load for the purpose of being lifted, without any knowledge of how it should have been done, could of itself be negligence. In addition, it was not shown that Adams was so experienced or skilled in steel erection

as to charge him with knowledge superior to that of Holloway. Since Adams was absent when the load was rigged and returned only after it had been lifted into the air, he cannot as a matter of law be said to have had superior knowledge of the dangerous situation. The doctrine applied in the Jump case is therefore inapplicable.

The Holloway Company next contends that even if there was negligence in rigging the load, this negligence was not the proximate cause of the accident. It is argued that the movement of the bin after one corner had been bolted down was an independent, intervening and superseding cause. In support of this argument, the appellant cites Newton v. Wetherby's Adm'x, 287 Ky. 400, 153 S.W.2d 947; Dixon v. Kentucky Utilities Co., 295 Ky. 32, 174 S.W.2d 19, 155 A.L.R. 150; and Hines v. Westerfield, Ky., 254 S.W.2d 728.

In Newton v. Wetherby's Adm'x, Dr. Wetherby's car door was equipped with two latches. The door had been shut by Dr. Wetherby but caught on only the first or safety latch. While the car was moving at a high rate of speed, an 11 year old boy who was riding in the car opened the door for the purpose of closing it more securely. When the door was opened, the boy was pulled from the automobile. The court, in holding that Dr. Wetherby's negligence was not the proximate cause of the accident, said, "* * * it was only the independent act of appellant in attempting to open and close the door which caused the accident, and *an independent act which Dr. Wetherby was under no duty to anticipate.*" (Emphasis added.) [287 Ky. 400, 153 S.W.2d 949.]

In the Dixon case an 11 year old girl was electrocuted when she came into contact with a wire fence. The fence had been charged by defendant's electric wire which had come into contact with the fence when a motorist had struck the pole supporting the wire. The court, in holding that the defendant's negligence in allowing the wire to sag to within three feet of the fence prior to the time the post was struck was not the proximate cause of the accident, said, "To constitute a 'proximate cause' of an injury, the negligence complained of need not be the direct or immediate cause, but it must do more, *unless the injurious result is foreseeable,* than merely furnish the condition or give rise to the occasion by which the injury was made possible." (Emphasis added.) [295 Ky. 32, 174 S.W.2d 21.]

Again, in the Hines case, it was said, "* * * If the original negligent act set in force a chain of events which the original negligent actor might have reasonably foreseen would, according to the experience of mankind, lead to the event which happened, the original actor is not relieved of liability by the intervening act." [254 S.W.2d 729.]

■ Holloway elected to participate in the rigging, knowing his own lack of knowledge and experience. He could have foreseen the necessity of movement to align the holes. Since the events occurring subsequent to Holloway's negligence were foreseeable, they are not such intervening or superseding causes as to relieve Holloway of liability for his negligence.

■ Appellants contend that Adams was guilty of contributory negligence as a matter of law. They state the proposition that every person in the exercise of ordinary care is required to exercise his intelligence and make such use of his senses in the interest of his own safety as would a reasonably prudent person under like circumstances. This proposition is sound, but the many cases cited in its support differ from the case at hand. They present situations where the particular plaintiff either had knowledge of the dangerous situation, or the danger was so obvious that an ordinarily prudent person would appreciate it. Adams was an experienced mechanic. He could read blue prints and knew how the batcher was to be assembled. However, it was not

shown that he had any experience in hoisting undertakings or in rigging heavy objects to be lifted. Since Adams was absent when the bin was rigged and did not return until the bin had been lifted some 20 feet from the ground, he did not know that the crane crew had not done the rigging and therefore there was no reason for him to closely inspect the manner in which it was rigged. We believe that reasonable men could differ as to whether Adams should have known of the dangerous situation and therefore he cannot be said to have been contributorily negligent as a matter of law.

Holloway next contends that the instructions to the jury with respect to the duties of the parties were so general in character as to have the effect of making the jury the judge of both the law and the facts. The trial court in the instructions imposed upon Mears, Hall and Gene Holloway the duty "to exercise ordinary care in the respective acts each was engaged in doing so as not to cause injury to Plaintiff Adams," and upon Adams the duty "at the time and place referred to in the evidence to exercise ordinary care for his own safety * * *." The instructions defined ordinary care in its application to Mears, the operator of the crane, to mean that degree of care usually exercised by ordinarily careful and prudent crane operators. Ordinary care in respect to Holloway and Adams was defined as the care exercised by ordinarily careful and prudent persons of like experience and skill.

As we view this case, there was very little conflict in the evidence as to what actually took place. No substantial issues were presented as to whether the plaintiff (or either of the defendants) had or had not violated specific duties the violation of which would constitute negligence. The only real issue was whether the parties had conducted themselves as ordinarily prudent persons. The *standard* of care with which the jury was required to be concerned was only the standard of the ordinarily prudent man—the evidence did not present any question of violation of specific standards of care such as would require the outlining of specific duties in the instructions.

■ If there is a question as to whether or not a party has violated a specific duty, the violation of which would constitute negligence, certainly the instructions should state that duty. Otherwise the jury is permitted to judge both the law and the facts. But if the evidence is substantially not in conflict as to what the parties did, and the only question is whether they acted as ordinarily prudent men, there is no occasion to instruct on specific duties. The result of attempting to instruct on specific duties in the latter situation would be to give undue emphasis to particular parts of the evidence, which this court consistently has condemned.

■ It is our opinion that the instructions were proper.

The next question to be determined is whether Mears and Hall remained servants of the Ambrosius Company or became the "loaned servants" of the Holloway Company. Negotiations between Gene Holloway and Fred Ambrosius, president of the Ambrosius Company, consisted merely of a discussion of the crane boom's length, the availability of the crane and the price per hour for its use. Fred Ambrosius testified that he did not know the particular use to which the crane was to be put. When the crane crew arrived at the location, Gene Holloway merely pointed out the work which was to be done. Mears explained to Holloway that he could not lift the bin and hopper together. Ambrosius stresses the fact that the crane was being rented and paid for by the hour. While this is a factor to be considered in determining whose servants the oiler and operator were, it alone is not controlling. Section 227 of the Restatement of the Law of Agency provides:

"A servant directed or permitted by his master to perform services for an-

other may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others."

A number of factors that may be considered in determining whether the person loaned or rented becomes the servant of one whose immediate purposes he serves are stated in § 220(2) of the Restatement of the Law of Agency, as follows:

"In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business of the employer; and

"(i) whether or not the parties believe they are creating the relationship of master and servant."

We think that here particular emphasis may be given to subsection (d) since the use of the crane required a highly skilled operator. Other significant factors are that the Ambrosius Company was engaged in a distinct occupation or business (subsection b), and that the work to be done was not a part of the regular business of the Holloway Company (subsection h).

As concerns the renting of machinery generally, the following comment is made under § 227 of the Restatement of the Law of Agency:

"A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise permits his servant and instrumentality to assist another, is more apt to intend to surrender control."

Although the Ambrosius Company was not in the exclusive business of renting equipment, the evidence shows that a portion of its business did consist of renting equipment.

The Kentucky cases relied upon by the Ambrosius Company all are distinguishable. In Hill v. Poindexter, 171 Ky. 847, 188 S.W. 851, L.R.A.1917B, 699, and in Board of Common Council of Frankfort v. Hall, 227 Ky. 599, 13 S.W.2d 755, the cities which

had rented steamrollers were engaged in street construction work as a part of their regular city programs. City employes were in complete charge of the details of the work, and were experienced in directing the use of the kind of machinery involved. In Bowen v. Gradison Construction Co., 224 Ky. 427, 6 S.W.2d 481 (second appeal, 236 Ky. 270, 32 S.W.2d 1014), Clendenin v. Colonial Supply Co., 267 Ky. 544, 102 S.W. 2d 992, and Tindall v. Perry, Ky., 283 S.W. 2d 700, the rented instrumentalities were ordinary motor trucks, which did not require special skill in operation and were not of exceptional value. Also, the lessees of the trucks were engaged in a regular business of which the operation of trucks was an essential feature. In Hickman v. Strunk, 303 Ky. 397, 197 S.W.2d 442, the vehicle involved was an automobile wrecker which one garageman had borrowed from another for the purpose of recovering a wrecked automobile for a customer of the borrower. The project was a part of the regular garage business of the borrower, and it involved a single operation over which the borrower assumed to exercise control.

■■ The argument of the Ambrosius Company is predicated almost entirely on the assumption that because the Holloway Company was in general charge of the erection of the cement mixing plant, that company had the right of control over all *details* of the work. We think that under the evidence there was a jury question as to whether the parties contemplated that the Holloway Company would have any right to control the details of the work of the crane. A fair conclusion from the evidence would be that the Holloway Company had no right to control the manner of operating the crane, or the mechanical assembling of the plant, but had control only as to coordinating these separate activities to achieve the ultimate result desired.

■ The Ambrosius Company raises the additional point in this connection that the "loaned servant" instruction of the lower court was erroneous. The instruction submitted only the question of whether Ambrosius had the right to control Mears and Hall at the time of the accident or whether Holloway had the right to control them. It is contended that this instruction furnished the jury with no factual basis upon which to arrive at the proper conclusion. We believe the instruction was a more favorable one than the Ambrosius Company was entitled to, because it omitted a number of the factors hereinbefore mentioned which would have encouraged a finding that the crane operator remained the servant of the Ambrosius Company. The complaint made of the instruction is not that it did not include enough of the determining *factors,* but that it did not set forth "the pertinent and determining facts." This argument is similar to the one hereinbefore discussed concerning the necessity for concrete instructions on negligence, and is rejected for the same reasons.

■ The Ambrosius Company further contends that the trial court erred in excluding certain evidence pertaining to customs and uses of the trade where equipment is rented and where there is a contract to perform a particular job. By avowal, experts asserted that in a contract to perform a certain job it is customary for the contractor to furnish a foreman and rigging crew and where equipment is only rented, these persons do not accompany the crane. This evidence was offered with the view of proving that the Ambrosius Company did not contract to do the entire job of erecting the mixing plant, from which the conclusion is sought to be drawn that the right to control the crane operator was in the Holloway Company. As we previously have pointed out, the fact that the Holloway Company had general control over the overall job does not mean that it had the right to control the details of the crane operation. We think the offered evidence was immaterial.

■ The Holloway Company cross-claimed against the Ambrosius Company

for indemnity on account of any damages that might be recovered by the plaintiff, Adams, against the Holloway Company. The trial judge refused to submit the cross-claim to the jury. The Rules of Civil Procedure provide for a cross-claim of this nature to be tried together with the subject matter of the original action. CR 13.07. It is within the power of the trial court, when as a matter of law no cause of action has been proven, to instruct peremptorily. The failure to instruct upon the cross-claim was in effect the equivalent of a peremptory instruction on the cross-claim. Indemnity between tort-feasors is allowed when the negligence of the person claiming indemnity is passive and secondary and the negligence of the person from whom indemnity is sought is primary and active. Gish Realty Co. v. Central City, Ky., 260 S.W.2d 946. We believe that as a matter of law the negligence of Gene Holloway, if any, was a concurring cause of the injury and not a secondary one. The trial court therefore committed no error in refusing to submit the cross-claim question to the jury.

It is further argued that the damages are so excessive as to require a reversal of the judgment. Appellants assert that the $75,000 verdict is the largest ever awarded in a personal injury case in this State. They contend that such a verdict could be sustained only on the basis of the complete destruction of earning capacity of a 45 year old man earning some $4,000 per year after taxes, and that there is no such basis in this case.

■ At the time of the injury Adams was 45 years of age, with a life expectancy of something over 27 years. He had worked for the C. W. Watson Company for nine weeks previous to his injury. He was paid $1.80 an hour and for the nine weeks' period had averaged $92.30 a week. His fall caused several of his vertebrae to be crushed against his spinal cord. This resulted in the loss of all feeling and control from the hips down. The doctors testified that his injury was of a permanent nature. It will be necessary for him to wear braces and his ambulatory function will consist of a shuffling movement. He will never be able to engage in any work requiring physical activity. Adams testified that he had lost the power of his sexual function and the physicians agreed that this was not an unusual result of this type of injury. The doctors further testified that Adams had been in great pain and it had been necessary to prescribe narcotics for him even after his operation. He is likely to have intermittent infections in the bladder and kidneys which will require periodic treatment. He will also need orthopedic treatment to prevent deformity. There is evidence to support a finding that the medical expenses incurred prior to trial and those that will be necessary in the future would amount to $15,000. Considering the loss of earning power, medical expenses and a reasonable amount for pain and suffering, it cannot be said that the $75,000 verdict was excessive.

Lastly, appellants seek a new trial on the ground that there was misconduct on the part of certain jurors in connection with their voir dire examination and this misconduct prevented appellants from having sufficient information upon which to base a judicious exercise of their peremptory challenges. During the course of the voir dire examination, the trial judge asked if any member of the panel had ever brought suit for personal injuries. In addition, the trial court asked if any member of the panel had at that time any claim for damages for personal injuries which was not in litigation. There was no answer from any of the members of the panel. Counsel for Holloway then asked:

"In addition to the question that the court asked you about a damage—having been a plaintiff or defendant in a damage claim or having asserted a damage claim, I would like to ask you the additional question: Have you ever been a plaintiff in any kind of law suit, whether it is a damage claim or not?"

Again there was no answer.

Counsel for the Holloway Company, in support of their motion for a new trial, filed an affidavit to the effect that jurors, J. Paul Lowe, Louis F. Glass and Francis McCauley, improperly failed to answer the questions propounded to them on voir dire examination. The affidavit showed that Lowe and Glass were respective plaintiffs in the suits of Lowe v. First and Glass v. Reed, both of which had been filed in the Jefferson Circuit Court. The affidavit further set forth hearsay information relative to the wife of Edward F. McCauley asserting a claim against the Louisville Transit Company and that the affiant believed Francis McCauley, who sat as a juror, was the same person as Edward F. McCauley.

Upon argument on the motion for a new trial before the trial judge, the contentions as to the last juror apparently were abandoned. Since there was no question propounded as to whether anyone had ever before had a claim for personal injuries and since the claim of Edward F. McCauley's wife, if indeed his wife had such a claim, had been settled without suit prior to this trial, this contention, insofar as juror McCauley is concerned, is without merit.

Upon examination of juror Glass it developed that Mr. Glass had been involved in an automobile accident in June of 1953. Mr. Glass is a brother-in-law of Joseph R. Pike, an attorney of the Jefferson County Bar. Glass told Pike of the accident and Pike said he would see what he could do. Glass did not know the suit had been filed. Pike testified that he had abandoned the action since the defendant was financially irresponsible.

The examination of juror Lowe revealed that suit had been brought by his insurance company and that Lowe's only interest had been $50, which he had expended for repair of his automobile pursuant to a $50 deductible insurance policy. Lowe had not engaged the attorney who had filed the suit and at the time of the voir dire examination he had not remembered the case.

 Where false information is given on voir dire examination, it does not necessarily follow that an illegal verdict will result. Where information innocently withheld is so insignificant or trifling as to indicate only a remote or speculative influence on the juror, the right of peremptory challenge has not been affected. Crutcher v. Hicks, Ky., 257 S.W.2d 539, 38 A.L.R.2d 620. The interests of jurors Glass and Lowe in the pending suits were so insignificant, and any influence resulting therefrom so speculative, that we cannot hold there was any substantial encroachment upon the appellants' right of peremptory challenge.

The judgment is affirmed on both appeals.