**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 10a0272n.06**

**Nos. 09-5182 & 09-5183**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| WILLIAM HARRIS ASHER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| ATLAS MATERIAL HANDLING, INC., a California | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant/Third Party Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| RACK CONVEYOR INSTALLATION, INC., | ) | |
| | ) | |
| Third Party Defendant-Appellee, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNARCO MATERIAL HANDLING, INC., a | ) | |
| Tennessee Corporation, | ) | |
| | ) | |
| Intervening Plaintiff/Defendant-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RACK CONVEYOR INSTALLATION, INC., | ) | |
| | ) | |
| Third Party Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: KENNEDY, COLE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

In this diversity action, plaintiffs, who are past and present Wal-Mart employees and their spouses, sued defendant Unarco Material Handling, Inc. ("Unarco"), and its subcontractor, defendant Atlas Material Handling, Inc. ("Atlas"), alleging injuries caused by exposure to carbon monoxide gas in the enclosed freezer section of a Wal-Mart Distribution Center during a two-week period in November and December 2005. Thereafter, Atlas filed a third-party complaint for common law indemnity or apportionment of liability against its subcontractor, Rack Conveyor Installation, Inc. ("RCI"), alleging that RCI was responsible for the release of the carbon monoxide. Unarco asserted crossclaims for contractual and/or common law indemnity against Atlas and RCI.

In this consolidated appeal, Unarco and Atlas appeal the following adverse rulings by the district court: (1) its Federal Rule of Civil Procedure 12(b)(6) dismissal of Unarco's crossclaims against RCI, based upon its holding that RCI is not Unarco's "coparty" under Federal Rule of Civil Procedure 13(g), and (2) its summary judgment dismissal of Atlas's third-party complaint against RCI, stemming from its holding that RCI's employees were Atlas's "loaned servants" under Kentucky law. We hold that Unarco's appeal is, pursuant to its stipulation, moot because the appeal was contingent upon our reversal of the district court's statute of limitations dismissal of the claims of certain untimely plaintiffs in related case no. 09-5158, and we recently affirmed that ruling. *See Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313 (6th Cir. 2010). Regarding Atlas's appeal, we hold that the district court erred in ruling that RCI's employees were Atlas's "loaned servants" as a matter of law, and we therefore reverse the district court's grant of summary judgment to RCI and remand for further proceedings.

I.

The district court accurately set forth the relevant background:

The Plaintiffs initially filed this action in Laurel Circuit Court on November 21, 2006, claiming damages as the result of an alleged discharge of carbon monoxide in the freezer section of the Wal-Mart Distribution Center in London, Kentucky ("Distribution Center"). According to the Plaintiffs, Defendants Unarco and [Atlas] caused the discharge in the course of repairing and installing rack systems and equipment. The Defendants jointly removed the action to this Court on December 18, 2006, on the basis of diversity jurisdiction.

Subsequently, on February 16, 2007, Atlas filed a motion for leave to file a Third-Party Complaint against RCI, claiming that RCI actually performed the repairs and installation at the Distribution Center on behalf of Atlas. The Court granted Atlas' motion, and the Third-Party Complaint was filed in the record on February 23, 2007. Thereafter, on July 17, 2007, the Court also granted the Plaintiffs' motion for leave to file an Amended Complaint.

On July 27, 2007, Unarco filed an Answer to the Amended Complaint and asserted crossclaims against Defendant Atlas and Third-Party Defendant RCI. Unarco claims that RCI actually performed the rack installation work in the Distribution Center, and that Atlas and RCI acted negligently in failing to report or remedy the allegedly defective generators used to perform the work. Accordingly, Unarco claims that it is entitled to contractual and/or common law indemnity from Atlas and RCI for the Plaintiffs' claims against Unarco.

Thereafter, on September 14, 2007, RCI moved to dismiss Unarco's crossclaim against it under Federal Rule of Civil Procedure 12(b)(6). In support of its motion, RCI asserts that "[a]n original defendant can not bring a crossclaim against a third-party defendant it did not join[.]" More specifically, RCI asserts that it is not a "co-party" of Unarco under Rule 13(g). In response, Unarco contends that there is conflicting authority regarding the definition of a co-party . . . .

(Internal citations omitted; second alteration in original.)

Finding no guidance from our court, which "has not addressed whether an original defendant

can file a cross-claim against a third-party defendant under Rule 13(g) or Rule 14(a)"[1] of the Federal Rules of Civil Procedure, and surveying conflicting authority on the issue, the district court found persuasive the authorities holding that "an original defendant is limited by the language of Rule 13(g) and can only bring crossclaims against co-parties." "Co-parties," according to the district court, are those sharing "like status[.]" (Internal quotation marks omitted.) The district court concluded that "Unarco and RCI do not share 'like status,' as RCI has not been sued by the Plaintiffs and is merely a third-party defendant to the action, while Unarco is an original defendant and a co-party of Third-Party Plaintiff Atlas." Therefore, the district court dismissed Unarco's crossclaims against RCI for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, but it clarified that the dismissal was without prejudice to permit Unarco

---

[1]Rule 13(g) provides:

**(g) Crossclaim Against a Coparty.** A pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action. The crossclaim may include a claim that the coparty is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.

Rule 14 provides, in relevant part:

**(a) When a Defending Party May Bring in a Third Party.**

> **(1)** *Timing of the Summons and Complaint.* A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it. But the third-party plaintiff must, by motion, obtain the court's leave if it files the third-party complaint more than 14 days after serving its original answer.

to re-file its crossclaims against RCI in a separate action for indemnity.

Thereafter, the district court entered the second order that is the subject of this consolidated appeal. That order granted RCI's motion for summary judgment against Atlas and denied Atlas's cross-motion for partial summary judgment against RCI, thereby dismissing Atlas's claims for common law indemnity or apportionment of liability against RCI. The district court ruled that, although RCI's employees performed the rack repair work which led to the release of the injury-causing carbon monoxide at the Distribution Center, RCI was not liable to Atlas under Kentucky law because "Atlas retained the right to control the work done at the location in issue" and "RCI's employees acted as loaned servants to Atlas[.]" In so holding, the district court rejected Atlas's arguments that (1) disputed issues of material fact precluded summary judgment in RCI's favor, and (2) RCI performed the work at the Distribution Center as an independent contractor.

Approximately two weeks later, the district court granted summary judgment in favor of Unarco and Atlas against certain plaintiffs (the "untimely plaintiffs") whose claims it held were barred by the applicable statute of limitations. Subsequently, Unarco and Atlas reached settlement agreements with the remaining, timely plaintiffs, and the district court dismissed the timely plaintiffs' claims with prejudice pursuant to the parties' January 2009 stipulations of dismissal. The untimely plaintiffs unsuccessfully appealed the district court's dismissal of their claims to this court in related case no. 09-5158. *See Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313 (6th Cir. 2010).

Unarco timely appeals the district court's Rule 12(b)(6) dismissal of its crossclaims against

RCI, but it stipulated during briefing and at oral argument that its present appeal should proceed only if we reversed the district court's dismissal of the untimely plaintiffs' claims in case no. 09-5158. Atlas timely appeals the district court's summary judgment dismissal of its third-party complaint against RCI.[2]

## II.

Unarco argues that the district court erred in dismissing its crossclaims against RCI. In the alternative, Unarco asserts that, "even if [its] pleading against RCI did not qualify as a cross-claim pursuant to Rule 13(g), the proper remedy was for the District Court to reclassify [the] pleading as a counterclaim rather than dismissing it for failure to state a claim, the harshest of all remedies."

We hold that Unarco's appeal is moot. Unarco stipulated that its present appeal should proceed only if we reversed the district court's dismissal of the untimely plaintiffs' claims in case no. 09-5158. Because we recently affirmed the district court's ruling in that case, *see* 596 F.3d 313, we do not consider the issue raised by Unarco in the present appeal.

## III.

Atlas argues that the district court erred in granting summary judgment in favor of RCI, Atlas's subcontractor, on Atlas's third-party claim for common law indemnity or apportionment of liability against RCI. The district court held that RCI's workers, who performed the work causing the release of carbon monoxide at the Distribution Center, were "loaned servants" under Atlas's

---

[2]The consolidated appeals are brought pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

control and, therefore, RCI was not liable to Atlas for their alleged negligence. Atlas contends that

the district court erred in ruling that RCI's workers were, as a matter of law, Atlas's loaned servants.

A.

We review de novo a district court's grant of summary judgment. *Longaberger Co. v. Kolt*,

586 F.3d 459, 465 (6th Cir. 2009). Summary judgment is proper "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The

moving party has the burden of proving the absence of genuine issues of material fact and its

entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When determining whether the movant has met this burden, we must view the evidence in the light

most favorable to the nonmoving party. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*,

477 F.3d 854, 861 (6th Cir. 2007).

B.

Under Kentucky law,

> a servant may be loaned or hired by his master for some special purpose so as to
> become, as to that service, the servant of the party to whom he is loaned or hired, and
> this is true even though the servant is selected, paid, and may be discharged by the
> original employer.

*Bowen v. Gradison Constr. Co.*, 32 S.W.2d 1014, 1016 (Ky. 1930). In contrast to a "loaned

servant,"

> [a]n "independent contractor" is one who is doing his own work in his own way
> . . . that is, he must have some particular task he has a right to complete and an
> obligation to complete, and he must be subject to no control in the details of its

doing.

*Id*. at 1017.

In determining whether a worker is a loaned servant/employee or an independent contractor,

[i]t is impossible to lay down a rule by which the status of men working and contracting together can be definitely defined in all cases as employees or independent contractors. Each case must depend on its own facts, and ordinarily no one feature of the relation is determinative, but all must be considered together. Ordinarily the question is one of fact. The principal consideration in determining the question is the right to control the manner of doing the work. Generally speaking, it may be stated that, if the employee is under the control of the employer, he is a servant or employee and not an independent contractor, but, if in the performance of the work he is not under the control of the employer, he is an independent contractor. However, it is not the actual exercise of the right by interfering with the work but the right to control which constitutes the test.

*Id*. at 1019 (citation and internal quotation marks omitted).

The district court held:

[I]t is clear that Atlas, not RCI, had the ultimate right to control the work done at the Distribution Center. In viewing the facts in the light most favorable to Atlas, it is undisputed that Atlas controlled the scope of the work, provided the rack repair kits to perform the work, directed RCI to use particular machinery including the propane generators, generally trained RCI's employees in how to perform the work, instructed RCI's employees to identify themselves as Atlas' employees, and requested daily productivity reports from RCI's crew leader.

Although acknowledging that Atlas did not always control RCI's workers, the district court concluded that "Atlas had the right to control the work, regardless of whether [it] exercised that right." According to the district court: "[T]he work being done was Atlas' work, Atlas had the power to direct how the work was done, and Atlas provided the materials and general methods for doing the work." In rejecting Atlas's contention that RCI was an independent contractor under these

circumstances, the district court stated that, "[w]hile certain facts indicate that RCI did not always follow Atlas' instructions and made some independent decisions (such as when to allow employees to take a day off and what welding method to use), these few instances do not detract from the Court's conclusion that Atlas had the *right to control* RCI's employees."

## C.

We hold that the district court erred in ruling that RCI's workers were Atlas's loaned servants as a matter of law. The district court's conclusion was based upon erroneous findings of fact and its failure to construe the evidence of record in the light most favorable to Atlas.

By way of background, Wal-Mart hired Unarco to repair, replace, and install storage racks that had become damaged and deformed over time after coming into contact with forklifts and other heavy equipment. Unarco subcontracted the rack repair work to Atlas, which, in turn, subcontracted it to RCI.

The district court's finding that "Atlas does not dispute that it controlled the scope of the work" is contradicted by the evidence of record. It is undisputed that Unarco, not Atlas, determined the nature and extent of the repairs required at the Distribution Center. RCI's cross-motion for summary judgment concedes that Unarco contracted with Atlas "to perform the work to be performed by Unarco under its contract with Wal-Mart" and that RCI merely "provide[d] the labor necessary to perform the rack repairs and installations . . . ."

Also inaccurate when viewed in the light most favorable to Atlas is the district court's finding that Atlas undisputedly "provided the rack repair kits to perform the work" to RCI. In fact, RCI

acknowledges that "Unarco . . . provided the materials for the welding work that was to be done, including the rack repair kits and drawings specifying how the repairs were to be made."

In addition, the district court erroneously implied that Atlas undisputedly made the decision requiring RCI "to use . . . the propane generators" that caused the release of the carbon monoxide. Although Atlas concedes that its national account sales manager for products and product manager for rack repair services, David Onorato, told RCI in an email that "the job is in a Freezer. . . . [d]efinitely have to use a propane welder[,]" RCI's own witnesses acknowledged that the directive came from Wal-Mart, which "demanded" the use of propane-powered generators because it does not permit gasoline-powered generators in food storage facilities like the London Distribution Center.

Regarding RCI's claim that Onorato told two of its employees to operate the generators *inside* the Distribution Center while performing the work, the evidence reveals a factual dispute. Onorato denies that he made the alleged communication, and RCI's crew supervisor at the Distribution Center, Willie Islas, concedes that, in view of Wal-Mart's approximately 90,000 square foot freezer, "it was almost impossible to leave . . . those generators outside and run welding cables for longer than 500 feet." Other evidence suggests it was accepted industry practice to place the generators inside a facility the size of the Distribution Center and close to the work area. Moreover, Wal-Mart was aware that the propane generators were being used inside, had no policy at that time prohibiting their use indoors, and did not perceive them to be a hazard.

Nor does the record support the district court's finding that Atlas required RCI to use other "particular machinery[.]" As discussed previously, RCI admits that Unarco supplied the rack repair

kits. RCI also concedes that it maintained a list of standard tools and equipment for use during rack repair work, and it independently selected and provided its crew with the hand and power tools, welding equipment, and rented generators needed for the job. Apart from the factual dispute regarding whether Atlas instructed RCI to use propane-powered generators, RCI does not allege that Atlas furnished it with tools or equipment or required that it use particular equipment.

Although the district court noted correctly that Atlas "generally trained RCI's employees in how to perform the work," it cites no authority, and we know of none, that a business's prior training or mentoring of another business is, in itself, sufficient to create a master-servant relationship between them indefinitely. A master-servant inference arising from the training provided to RCI is particularly questionable on these facts for several reasons. First, it had been more than a year since RCI crews last worked alongside Atlas employees to learn the rack repair work, and RCI had successfully performed such work alone on several occasions. Atlas's training of RCI employees was part of its process of "discontinu[ing] the practice of using direct Atlas employees to install and repair racks[,]" which, in the past decade, had generated only five percent or less of Atlas's revenue.[3] Since 2004, Atlas was "using subcontracted labor exclusively for rack repair projects[.]" By contrast, RCI derived seventy percent of its revenue from rack repair work. Rather than predestining a ruling that Atlas controlled or desired to control RCI's employees in the performance of their work as a matter of law, this evidence supports the opposite inference as well – Atlas sought to quit the rack repair business entirely, transfer that portion of its business to RCI, and, to do so, it trained RCI

---

[3]Atlas's sale of wire mesh storage products accounted for 95% of its revenue.

to work independently and without Atlas's supervision.

Moreover, the training Atlas provided to RCI was limited. RCI's employees were experienced in, and did not require training or instruction in, the use of the welding equipment, portaband saws, hand tools, and generators needed to repair and install racks. Before forming RCI in 2003, RCI's president and co-owner, Walt Thompson, had substantial experience in "conveyor, dismantle, installs, new rack, used rack, so it kind of ran the whole gamut." Likewise, Islas was previously "in charge of [a] warehouse" and had worked with warehouse assembly systems, installing and repairing them. Islas concedes that Unarco's rack repair kits came with detailed instructions and drawings, and Atlas did not deviate from the instructions when training RCI. According to Islas, "The only thing that the Atlas crew explained to us is how to use the hydraulic jack, the new piece of equipment that we were going to use," and training on the hydraulic jack took only "a couple of days."[4]

Further, Atlas never trained RCI to perform rack repair work or installation in a freezer facility like the Distribution Center; rather, its training was confined to ambient temperature warehouses. Nor did Atlas provide instructions to RCI about working with generators indoors.

Most significantly, the district court's conclusion that Atlas, as a matter of law, controlled or "had the ultimate right to control" RCI's employees and the manner in which they performed their work is simply unsupported by the evidence of record. In this regard, it is clear that RCI determined

---

[4]The 20-ton Easy Lift hydraulic jack can lift up to 40,000 pounds and was used to hold the upper levels of the rack system in place while the support struts were repaired.

the number of employees to send to the Distribution Center, and it selected all crew members, including the welders and crew supervisor Islas. Islas "supervised the RCI workers[] [and] direct[ed] the work performed by them[] on a daily basis[.]" When asked in his deposition, "[W]ho's in charge of the crew?" RCI co-owner Walt Thompson responded unambiguously, "The supervisor."

Walt Thompson's wife and RCI co-owner, Sheri Thompson, testified that RCI instructs its employees on "[t]he specifics of the job" to be completed and that, before beginning work at a particular site, RCI's supervisors "inform the crew as to any hazards, dangers or anything the crew should be aware of[.]" If a problem occurred at the job site, Islas was required to report it to RCI's home office. RCI's control over its workers was exemplified when the London crew experienced difficulties with the rented generators expelling their dipsticks. Islas consulted with RCI co-owner John McDermott in RCI's home office about the matter, but he neither informed nor sought guidance from Atlas.

If an RCI employee was injured on the job, Islas had to inform RCI and Wal-Mart, but not Atlas. Sheri Thompson agreed that if "there is an incident where an RCI employee claims some type of injury . . . or . . . some physical problem on the job, RCI doesn't rely upon Atlas to investigate that injury"; rather "RCI would take its own steps to try to find out what was going on . . . ." When RCI crew members experienced symptoms of headache and fatigue at the Distribution Center, it was Islas, not Atlas, who made the decision to give them the day off, and Islas only informed Onorato because Islas considered himself to be a "professional" whose duty was to notify Onorato of delays in the project's completion.

Also indicative of RCI's autonomy is its selection of the welding technique used at the Distribution Center. Although Atlas trained RCI using the metal inert gas, or "MIG," welding method, RCI made the independent decision to use the "arc" welding procedure, which purportedly requires "different technique, equipment and skills" than the MIG type. (Internal quotation marks omitted.)

In stark contrast to RCI, Atlas had no personnel at the job site. Onorato was the only Atlas employee who maintained "direct communications" with RCI at the Distribution Center, and he did so from a remote location while lacking "personal expertise [in] installing or repairing racks." Onorato swore in his affidavit that "RCI had total control over the manner in which RCI accomplished the final result[,]" and neither Atlas, nor Onorato specifically, had the authority to terminate RCI employees. Although the district court observed correctly, and Atlas concedes, that Islas was required to advise Onorato of its progress daily, Onorato stated that he "never instructed RCI to complete specific tasks at a specific time[.]" RCI cites no authority that mere communication between contractors about the progress of work that is of mutual interest demonstrates control as a matter of law – on these facts, it may more accurately suggest cooperation, as well as preoccupation with results, rather than methods.

The district court deemed it crucial to the loaned servant inquiry that Onorato instructed RCI crew members to hold themselves out as Atlas employees. Although Atlas admits this fact, RCI and the district court fail to support their view that it relegated RCI employees to "loaned servant" status

as a matter of law. Notably, RCI does not expressly argue theories of apparent authority or estoppel,[5] even though it implies them, and the district court did not base its ruling on either. Moreover, it remains that "[t]he principle consideration in determining the question [of whether a special employment relationship exists] is the right to control the manner of doing the work[,]" *Bowen*, 32 S.W.2d at 1019, not simply whether the parties "believe they are creating" a master-servant relationship, *Ky. Unemployment Ins. Comm'n v. Landmark Cmty. Newspapers of Ky., Inc.*, 91 S.W.3d 575, 579-80 (Ky. 2002) (quoting Restatement (2d) of Agency § 220(e)(2)), or how third parties might have perceived RCI crew members' business affiliation, *see United Eng'rs & Constrs., Inc. v. Branham*, 550 S.W.2d 540, 543 (Ky. 1977) ("[I]n determining whether one is an agent or servant or an independent contractor, substance prevails over form, and . . . the main dispositive criterion is whether it is understood that the alleged principal or master has the right to control the details of the work."). It is undisputed that Atlas and RCI agreed to represent themselves as a single business – Atlas – so that both companies would not compete for Unarco's business. There is no evidence suggesting that this form over substance business arrangement granted Atlas control over the manner in which RCI completed its work.

Finally, in holding that RCI's employees were Atlas's loaned servants as a matter of law, the

---

[5]In any event, apparent authority would support an agency, not necessarily a master-servant, relationship. *See Kelley v. S. Pac. Co.*, 419 U.S. 318, 325 (1974) ("[A] finding of agency is not tantamount to a finding of a master-servant relationship."). Moreover, while Kentucky has applied estoppel to prevent one from denying an agency relationship, *see CSX Transp., Inc. v. First Nat'l Bank*, 14 S.W.3d 563, 568-69 (Ky. Ct. App. 1999), neither the district court nor RCI cite authority invoking the estoppel doctrine in the master-servant context.

district court relied erroneously upon two cases, *Tindall v. Perry*, 283 S.W.2d 700 (Ky. 1955) and

*Decker v. Glasscock Trucking Serv., Inc.*, 397 S.W.2d 773 (Ky. 1965). Both cases held that a

master-servant relationship existed, but they did so because the purported special employer was

physically present or controlled, or had the right to control, the details of the alleged loaned servant's

work. *See Tindall*, 283 S.W.2d at 701 (holding that nominal employer "relinquished whatever

control or right of control [it] may have had with respect to that day's activity" because it neither

"undertook to, [n]or had the right to direct[,]" its employee, and the special employer's "foreman-in-

charge" was physically present, "instructed" the employee, and had "immediate, ultimate and

residual control" over him) (internal quotation marks omitted); *Decker*, 397 S.W.2d at 775 (finding

a master-servant relationship where the alleged master "had the right to control the [servant's]

trucks[,] . . . could work a truck or not work it on a particular day[,] . . . could designate when and

where each load of material was to be transported[,] . . . could direct the route over which it was to

be hauled[,] . . . could begin or terminate the movement of a truck at any time[,] . . . furnished the

gasoline and the spare parts, at cost, which was later deducted, . . . paid [the servant] on the basis of

so much per ton per mile [,] . . . and [i]n truth, [the servant's] truck driver was working regularly for

[the master] under continuing instructions in the performance of daily work that was an integral part

of [the master's] business."). *Tindall* and *Decker* are clearly distinguishable from the present case.

Atlas had no presence at the job site, and no Atlas employee directed the manner and details of the

rack repair work.

The present case more closely resembles *Ambrosius Indus., Inc. v. Adams*, 293 S.W.2d 230

(Ky. 1956). There, Holloway bought a concrete mixing plant from Watson. Watson sent its

employee, Adams, to the plant to help with some assembly. Holloway also rented a crane and two

crewmen from Ambrosius to lift various plant structures into position. Adams was injured while

assisting employees of Ambrosius and Holloway with certain crane operations. The court considered

whether the Ambrosius employees were functioning as loaned servants of plant owner Holloway at

the time of Adams's injury. Holding that the issue presented a question for a jury, the court held:

> The argument of the Ambrosius Company is predicated almost entirely on the
> assumption that because the Holloway Company was in general charge of the
> erection of the cement mixing plant, that company had the right of control over all
> *details* of the work. We think that under the evidence there was a jury question as
> to whether the parties contemplated that the Holloway Company would have any
> right to control the details of the work of the crane. A fair conclusion from the
> evidence would be that the Holloway Company had no right to control the manner
> of operating the crane, or the mechanical assembling of the plant, but had control
> only as to coordinating these separate activities to achieve the ultimate result desired.

*Id*. at 237.

Like *Ambrosius Indus., Inc.*, a reasonable inference in the present case is that Atlas's role was

merely to coordinate the repair project between Wal-Mart, Unarco, and RCI, not to control, or have

the right to control, the manner in which RCI repaired and installed the racks. Because the master-

servant inquiry is "[o]rdinarily . . . one of fact[,]" *Bowen*, 32 S.W.2d at 1019 (citation and internal

quotation marks omitted), and we believe that general rule to be applicable on these facts, we hold

that the district court erred in deciding the issue as a matter of law.

IV.

For these reasons, we (1) dismiss Unarco's appeal as moot and (2) reverse the district court's

grant of summary judgment to RCI and remand for further proceedings consistent with this opinion.